All right, when everybody's ready, we're ready. Case numbers 2018-99 and 2019-00 Whirlpool Financial Corporation et al v. CIR and Whirlpool International Holdings v. CIR. Oral argument not to exceed 20 minutes per side. Mr. Gar for the appellant. Thank you Judge Kethledge and may it please the court. With the court's permission I'd like to reserve three minutes of my time for rebuttal. You got it. Last time we were both in this courtroom, you know, we were both on that side. Yeah, that's right. All right, yeah. Your honors, this case arises because Whirlpool availed itself of a legitimate economic program enacted by the government of Mexico to attract jobs, which the United States government itself has supported. Whirlpool will pay U.S. taxes on all of the income at issue at this case. The only question is when, and in particular whether the income at issue qualifies as foreign-based company sales income, a narrow exception to the general rule that foreign income is not taxed by the United States until it's repatriated into the United States. Now there are a lot of complex questions in this case about how to calculate foreign-based company sales income, but this appeal turns principally on a straightforward question of statutory interpretation that ultimately reveals a classic case of agency overreach under the Chevron doctrine. Section 954 D2 of the tax code, which is reproduced... Can I ask you a question about the judgment because I'm a little bit confused by it. The court says it's not granting summary judgment on the D1 theory. Either way, manufacturing exception. It says that under D2 it's going to grant summary judgment and then grants judgment for the government. What happens... Where is D1 though? Doesn't the transaction... How do you calculate the amount? Doesn't the transaction still have to meet one of the D1 requirements? And since there was no summary judgment on that, why is there judgment ultimately? Your Honor, I think the government has to show that the income qualifies as foreign-based company sales income on either D1 or D2. So I think the tax court thought that its judgment on D2 would be sufficient. Now if this court were to disagree with its judgment on D2, then it would have to at minimum send it back for the court to conclude it's working... Do you think D2 is self-executing? No. No. We think it was only executing with the regulation exceeds the scope of the statute, then D2 is not self-executing. But the regulation by its own terms doesn't really tell you what the foreign-based company income is, does it? Well, I mean, critically... Mechanically? I mean, doesn't it refer back to D1? That subsection 3 of the reg is what I'm thinking of. There's a subsection that says, and you do it in accordance with the other regs, the D1 part. Right. I mean, I think ultimately the government would have you apply the regulation back through D1, which I think is a problem in itself. But I mean, I think the fundamental problem with the regulation is the focus is on income of the remainder, which by definition is not income of the branch. It's a fictional concept created by the regulation. I think if you align that with the statute in section 954 D2, the statute is focused explicitly on income of the branch. It's unambiguous. I don't know about that, but I mean, just as a foundational matter, I mean, I've read the tax court opinion to hold that this was this horrible FBCI acronym, like worst acronym ever. I try not to say it wrong. Yeah. Under both D1 and D2. I mean, I thought, you know, like the tax court judge notably said, you know, D2 by its terms seems to, it says, shall be, you know, this kind of income. But then he also routes it back through D1 and says, okay, since we're treating this, the branch as a sub, which is what it actually is, but now we're treating it that way, one is selling on behalf of when. So, I mean, I just thought the court held on both, under both provisions, both subsections. Well, I would disagree with your honor. I mean, I think to take them in turn. Did he say there were material issues of fact as to D1? He reserved judgment on D1, but as to the argument that the government made again in its rule 28J letter, the suggestion that they satisfy D2 because our position is that it's income of the branch, that wasn't their theory. Their whole theory is that it's they're casting this as income of the remainder because the income of the branch here is classic manufacturing income that would not be covered by D1. I mean, that's not an issue. Well, we're talking about WOM's income, right? WOM got like 45 million from the sale to Whirlpool. Well, you don't agree with that, but I mean, there was a transfer pursuant to a contract, a supplying contract between WOM and Whirlpool. Yes. By which Whirlpool and Whirlpool Mexico take title to the finished goods. And we're talking about, when we say WOM, just to be clear, when I refer to that, I'm referring it to the Mexican branch, the Mexican operations of WOM. I mean, there's the Luxembourg office, which is the so-called remainder. But I also want to... Right, right. The IRS calls it Lux. Right. It's a single office. To make it even more interesting. Exactly. Just to keep you guys on your toes. Right, but so we're talking about that 45 million, and I mean, WOM is part of the subsidiary, and the Luxembourg home office of WOM is what the government calls the remainder. The branch operations in Mexico is where all the manufacturing took place. It's where the products were transferred, and these were all pursuant to manufacturing contracts that were priced at arm's length. The government just doesn't dispute that as cost plus six percent. So one question before the court is whether or not the income from those which by definition is not covered by D1, or sales income. But I want to go back to the notion that the regulation gets the government into D1. Because, I mean, you're right. The government uses the on behalf of magic of the regulation to loop this back into language in D1. But the only way that it can get there is through the regulation. And the regulation, again, is based explicitly on the notion that income of the remainder can be deemed form-based company sales income. And that's just not what the statute says, Your Honor. I mean, if you look at 954D, and it's... When you say that about the reg, can you just point me to the language in the reg that you're referring to? Yes. What I would point you to, Your Honor, and there's three places I would point you to, and this is in the addendum to the opening brief at page 103 of the entire document. It's a little bit difficult to follow, but if you look up at the upper right-hand page of the addendum, there you have Treasury Regulation 1.9543B1II, the two Romanets. And that establishes what the parties refer to as the manufacturing branch rule. I mean, one thing that's notable about that is you have the sales branch rule, which is in Romanet I. That tracks the language of 954D2. And then you have the manufacturing rule, which is in Romanet II, which is this new rule. So that's that's point one. And then point two, I would point you to 9.543B2 Romanet II, which is on page 105 to 106 of the addendum. And with that section, and in particular B Romanet II C makes clear, is that they're recasting income of the remainder as foreign-based company sales income. And the example on page 107 of the addendum, example two... I have this addendum thing. I'm sorry, Your Honor. It's part of the blue brief? It's part of the blue... it should be attached to the end of the blue brief. That's all right. Don't let me trip you up. If you have the regulation, I can refer you to the regulation. Yeah, I do have that. So if you look in the regulation, and again I'm starting the Romanet II, which is a special rules which tells you how to apply this manufacturing... Is this the one that says manufacturing branch? It does, but it's but it's below that. I mean, in addition to being hard to read, it's hard to follow with the indentations. All right. Is this determination of foreign-based company sales income? Exactly, Your Honor. All right. Which should be C, the little I. And there it tells you how to determine it, and you'll see that at the end it talks to the remainder of the controlled foreign corporation or the branch, but here the government's theory, and this is clear on page 48 of its brief, that its theory is that this is income of the remainder, shall be foreign-based company sales income. And then if you look at the example two, which comes a little bit further down in four, that's a classic example of what the government is trying to do here, where it's deeming income derived by the remainder, which is not a concept mentioned in the statute, and is by definition not the branch, may be deemed or constitutes foreign-based company sales income. And so what they've done in effect, Your Honor, is create a new subsection D3 of the statute to deem a whole new category of income not covered by the statute, foreign-based company sales income, non-branch income, that is in this fictional concept that the government describes as the remainder. Okay, I get your regular... I think I get your regulatory argument. I want to talk to you about D2 itself, right? So let's just forget about the regs for a moment. I'll confess, I mean, I'm struggling a bit to see why Judge Lauber in the tax court was mistaken when he basically said, you know, if you read D2, it basically answers the question in this case, period. I mean, we have a... the IRS talks about two conditions and two consequences. I mean, the first condition's met, right? I mean, at least with respect to WAM being headquartered outside of Mexico, the place of manufacture, right? Now, you dispute whether having WIN treated like a branch creates substantially the same tax effect as having it as... as treating WIN like a wholly owned sub. Do you dispute that second precondition, or you basically... Yes, I mean, WIN, to be clear, is a disregarded federal tax entity, a so-called check-the-box entity, which is merged into WAM's manufacturing branch, which is in Mexico, for all purposes. So it makes them a branch? It makes them the part of the branch. There's not two branches. There can only be one branch, and if you look at the definition of the branch, which is in the government's brief, page 3, note 3, we agree with that. It's the business function of what's happening in Mexico, and what's happening in Mexico is, as appliances are being manufactured by WAM in Mexico, one part of which is WIN. Well, but that's, again, that's a fiction. They can't divide up the branch. WIN provides the labor, Your Honor, but WAM provides hundreds of millions of dollars in raw materials, tooling, space to manufacture. I mean, we're talking about building... Well, wasn't the Mexican government told that the Maquiladora, the assembler here, was WIN? There are a lot of representations to different governments, and I'm happy to walk through them, but it was told that WAM was manufacturing the appliances, which is true. And just to go back to D2, Your Honor, I don't think that the statute covers it anyway without getting into the regulation. It doesn't for two, just two fundamental reasons. Well, let me, okay, let me just walk through the, okay, let's say, I know you disagree, but let's say that second condition as well is met, okay? That the substantial, treating WIN like a branch creates substantially the same tax effect as if WIN were a wholly owned sub. I know you disagree, but let's just assume that that Judge Lauber was correct about that. And so then we move on to the two consequences, one being that the income attributable to the carrying on of such activities, of such branch, shall be treated as income derived by a wholly owned sub. So now we're treating WIN as a separate sub and shall constitute foreign-based company sales income of the controlled foreign corporation, which would be WAN here, right? So I mean, you know, so my question for you is, you know, if those two conditions are met, why isn't, why doesn't D2 end it? Two reasons, Your Honor. First, the government's theory that is maintained from the notice of deficiency on in this case repeatedly is that it's income of the remainder, not income of the branch. So you'd have to effectively throw out the government's theory and replace it with the theory that it's income of the branch if we're deeming WIN the branch, which was the hypothetical Your Honor gave me. So that's one. It's a brand new theory if you want to think of in terms of Chenery. I mean, I don't think the government can do that. I don't think this Court could do it for the government. But the more fundamental point is, you're right that it talks about income of the branch, but it's meant, it, but it doesn't really, not quite. I mean, it says income attributable to the carrying on of these activities by the branch. Of such branch, right. So, but that, that type of such branch is modifying activities there, not income. Well, that's fine, Your Honor, but it, but it's being done by the branch. The government's theory is it's being done by the remainder. It's a different entity. It's not the branch. I mean, I'd love for you to ask the government that question, but they're not saying that the activity, except by the fiction of the regulation, they're saying that this is being done by the remainder. Sales are being, taking place in Luxembourg, which is completely counter the facts on the ground here. But the other point is that it does say income, but it's got to be sales income. In order for income of the branch to qualify, well, this is a provision about foreign-based company sales income. And, and if you go, and I think in order to understand D2, you've got to under, you've got to look at it through the lens of D1, because the first clause of D2 refers to foreign-based company sales income. And it's clear from D1 that D1 does not cover manufacturing income. It was never designed to cover manufacturing income. Income from products that you purchase one product, like here we purchased raw materials and we manufactured into another product, finished appliances. That income by definition is not foreign-based company sales income. Congress didn't want to cover that. Congress wanted to cover the situation where companies were establishing foreign outposts, basically on paper, purely for the reason of that has a subsidiary in China that manufactures computers. That Chinese subsidiary then has a branch in the Cayman Islands, which purchases the finished computers from the Chinese subsidiary for, say, $1,000 a computer, and then turns around and sells it all around the world for $1,080 a computer. The $80 in those sales is a classic situation of foreign-based company sales income. This is what D2, D1 is getting out because it's sales income. And D2 would be covered because that's a sales branch. This case is fundamentally different. Wait a minute. So the $80 margin is foreign-based company whatever income? Sales income. Sales income, right. Because there's no manufacturing. The sales branch is not doing any manufacturing. The branch in Mexico here is buying raw materials, and it's turning them into finished refrigerators. But that company entity in that hypo is not manufacturing either, right? The Cayman Islands entity is the branch that's purely engaged in sales, and the Chinese subsidiary is manufacturing the computers. I know you kind of dispute whether WOM is doing selling activity, but WOM has an agreement with Whirlpool by which WOM agrees to provide these finished washers and refrigerators, right? And WOM got $45 million of income from that agreement. Is that correct? Factually? That is correct. And so why isn't that like the $80 per computer in the Cayman example? Because the reason why it's getting that money is it's getting it on cost plus 6% contracts, which are the contracts that go to the payment of building refrigerators and washers. And, you know, we don't think that WOM, the branch is engaged in any, that WOM Luxembourg is engaged in selling activities here. Because the products were transferred in Mexico, that's where the sale takes place. But if you disagree with that, you should at least say there's a disputed issue about how much of the $45 million is attributable to sales versus manufacturing. Because it's absurd to say that it's entirely attributable to sales, which is what the tax court held here. Because, I mean, again, the question is, when they made $45 million in manufacturing contracts that are cost plus 6%, at arm's length the government doesn't dispute that, did that money go to Whirlpool because they made refrigerators and washers? Or did it go to Whirlpool because they simply... Is that an option you gave to the tax court? So, not in those terms, your honor. What we did was we said that none of the income was sales income. But when the tax court rejected that, we think that we can go to this court and say, we think that's wrong. But if even if you disagree with that, you should at least say there's a disputed issue on how much of it is sales income. And as we point out in our letter on the Mayo Clinic case, the government made the same exact series of arguments in the Mayo Clinic case, and the Eighth Circuit ultimately remanded for a factual dispute on that issue. In that situation, would we have to apply the manufacturing exception from D... Somebody would have to apply the manufacturing exception from D1 to part of the money? What you would do to get there is you'd have to say the regulation is valid. Of course, we don't think it is. But if you think the regulation is valid, and that you conclude that, you know, it's unclear whether all of this income is sales income, then you would remand it to the tax court to say that there's a factual dispute on how much of the $45 million can we attribute to sales activity, fictional sales activity, that's not really taking place in Luxembourg. That would be the remand on the D... That would essentially be a D1 remand, right? That would be a D2 remand, Your Honor. It would be applying D2 to the situation here. The D1 issue would still remain separate. I mean, the D1 issue is really whether or not manufacturing income qualifies as sales income. And frankly, we think that's a legal issue decided by the statute and that this court could decide as well. But, you know, if the court doesn't want to reach that because the tax court didn't, you know, we appreciate that and you may want to remand on that. But this issue about the disputed issue material fact would be a D... It would be if you conclude that the regulation is valid, you should at least say there's a disputed issue about how much of this $45 million can we really say is attributable to sales versus manufacturing? I mean, the answer can't be that all of it's attributable to sales. And none of us is going to the fact that Whirlpool actually made refrigerators and washing machines and... Well, I mean, if one accepts the proposition that Wynne's doing the manufacturing, I know you disagree with that. But if Wynne's doing the manufacturing, I mean, Wynne got paid something by... Did they get paid something? Well, about $4 million is what we acknowledged was the income. But... But so they paid 17% under Mexican law on something, right? Or am I wrong? I actually don't know the answer to that. Okay, I don't either. You know, I think it's $4 million is the income that we attributed to... It's a minimal, like 0.5%. Right. It's a tiny fraction on the contracts. But, you know, just to zero in on... But my point on that, though, is, I mean, aren't there representation... Haven't representations already been made to the Mexican government about the... About Wynne's manufacturing income? Well, what we... The representation we made to the United States government, this is in the 5471 form, actually the 8858 form, which is at appendix 2333, was that $4 million of income was attributable to Wynne. And the reason why it's a tiny fraction... And so Whirlpool would pay tax now on that or wait until there's some distribution? Wait until there's a distribution under our theory. But again, like Wynne is just the component that actually provided the labor through leased employment. Well, I mean, yes, okay, on paper, but I mean, really? I mean, so before 2007, nothing changed on the ground, right? I mean... That's right. Nothing changed on the ground. There was just a, you know, just it got papered so that certain entities had certain control. Well, Your Honor, that's right. And I would say too that, you know, before 2007, before things were changed, all of this income was deferred. None of it was foreign-based company sales income. So the government's position is that suddenly because of actions that were taking place to comply with the Miquiladora program, this suddenly turned into income that they could tax immediately. And we think they're wrong about that. But to say that Wynne did all the manufacturing is to say that none of the hundreds of millions of dollars in raw materials, tooling, equipment that is necessary to manufacture these refrigerators and washing machines, which all of which is owned by WOM, is relevant to the production of these appliances. I mean, that's counterfactual. That's counterfactual. It makes no sense. Help me out, if you will. You know, I'm just a country lawyer. So Whirlpool makes a decision, business decision, that it's going to set up a corporation in Luxembourg, for God's sake. One, I guess, part-time employee? Why did you do that? We did that to comply with the Miquiladora program, Your Honor. The Mexican law in order to take advantage of this worthwhile program that the United States government has supported. Tax avoidance. It's not tax avoidance, Your Honor. Not at all. And that's a critical point. Again, we will pay taxes on all the income in this case. We did it to comply with the Miquiladora program, which brings jobs into Mexico. And one element of that is that there would be a foreign principal. And there's nothing wrong with... Why couldn't Whirlpool U.S. be the foreign principal? It could have been, Your Honor. It could have been. But Whirlpool U.S.? I don't mean to hijack your question. Go ahead. Well... I was going to say, let's say it was Whirlpool U.S., hypothetically. Do they have to pay tax on $45 million of income... They would have... ...in tax year 2000? They would have because it would be a branch, not a subsidiary. In a subsidiary situation... Well, I mean... But there's nothing wrong with that. I mean, the United States isn't claiming that these are any sham arrangements, that they're illegitimate. They're legitimate arrangements. There's nothing wrong with establishing... But, I mean, to go back to Judge Norris's question, you didn't need Lux to have a foreign owner of wind. Whirlpool could have done that. Yes. But one could infer that you needed Lux instead to avoid Whirlpool paying income tax on $45 million in tax year 2009. Well, I don't think... I take it that's an inference, Your Honor. But it's not... I mean, that's... It's not an improper result. It doesn't change the result in this case because, A, there's no reason a U.S. taxpayer can't establish a subsidiary in Luxembourg. Luxembourg is not a tax haven. It has a treaty with Mexico. It's a legitimate foreign government that taxes... It was pitched... I mean, but this whole thing... Not... Listen, I'm not doing this based on purpose. Right. Okay? But the whole thing was pitched as a tax avoidance. Your Honor, I just would push back on tax avoidance because, again, before 2007... Tax deferral. Okay. Which would maintain the status quo. Middle ground. That's fine. I'll take that. Before 2007, tax was deferred when the appliances were manufactured in Mexico. After 2007, our position is tax is deferred. The government, you know, if he wants to talk about the different corporations, that's fine, but these are all legitimate entities. The government hasn't suggested they're subject to sham. And the question ultimately is whether or not they can deem this income, foreign-based company sales income, on the countertextual notion that the income of the remainder, a concept not mentioned in the statute, somehow allows them to go back in and transform this category into foreign-based company sales income. And we don't think it does. All right. We're going to hear from Ms. Hagley, and then you'll have a rebuttal. Good afternoon. May it please the Court. Judith Hagley from the Department of Justice, representing the Commissioner. This transaction was set up to do exactly what Congress was trying to target in Section 954, to strip off the sales income from the Mexican operations and allocate it to the Luxembourg entity to void all tax on that sales income. This is made clear in the PowerPoint presentations that are discussed in our brief on pages 13 and 1301 through 1304 of the record, that the whole goal was to move profits from the United States and from Mexico to Luxembourg. Okay. Let's say that's true. That is true, and that is what That's just back, that's just sort of atmospherics. I was trying to Oh, yeah, no, you're right. You're right. That's right. Sorry. And to respond to Judge Nelbandian's question, just to sort of set what we're talking about here with regard to the judgment, the Commissioner made two determinations in the notice of deficiency, that there was foreign-based company sales income under Section D1, and under D1 you treat the CFC and the Mexican branch as one unit, and also there was foreign-based company sales income under D2, where you treat them separately. The Commissioner moved for summary judgment only under D2, because D1 raised a factual issue of, if you look at the CFC and the branch as one unit, does the regulatory manufacturing exception apply? I don't understand that. Don't you have to run the D2? I thought D2 was just, and this is the way I read your brief in footnote 14, whatever, you read D2 to set up this operation as a branch and then it's a sub, but you still have to go back to D1 to figure out whether the transaction, which means that you have to look at the manufacturing exception, don't you? You don't need to look at the manufacturing exception, because you were treating, when D2 applies, the branch and the remainder, the CFC, are treated as related parties, separate subsidiaries, and the manufacturing of the manufacturing branch rule is being done by the separate subsidiary, not by the CFC, so therefore the regulatory manufacturing exception does not apply. But does that mean that all income from that branch, doesn't matter whether it's sales, manufacturing income, whatever it is, shall constitute foreign-based sales income under D2? No, under D2, as interpreted by the regulations, the only income that's going to be sales branch income, that will be, I'm sorry, that will be foreign-based company sales income, is income that satisfies one of the four transactions under D1. So here... So you're just saying D1 applies, just the exceptions to D1, the manufacturing exception doesn't apply? Right, D1 itself, including the same country exception, would apply. So in this situation, Luxembourg is selling to related parties, and under operation of the regulation, on behalf of related parties, products that were manufactured through the manufacturing branch. It's outside of, the property is manufactured outside of Luxembourg, and it's sold for use outside of Luxembourg, and that's why the same country exception that's within the statute does not apply to this transaction. When you talk about the manufacturing exception, I think is the way you put it, the reg that I think we talked about earlier, you say that doesn't apply when D2 does apply, right? When D2 directs us to treat the branch as a wholly owned sub. I'm just trying to understand... That's right, because the entity that is selling, which is in this case, one, the Luxembourg entity, doesn't have any manufacturing operation, because that's a separate subsidiary. It's a branch treated as a separate subsidiary. Okay, am I wrong though? There's some part of the reg that says specifically that paragraph A of the section applies, but not the exceptions. In other words, if the exceptions aren't supposed to apply, the reg says it specifically. That is correct. They don't apply for purposes of determining whether there's a tax rate disparity. Right, yes, under the tax rate. But that same provision isn't in 1B, or whatever the section E 1.95, whatever, B22E that just says income derived by the branch or similar establishment or by the remainder shall not be considered foreign-based sales income if the income would not be so considered if it was derived by a separate controlled foreign corporation under like circumstances. So don't you just apply the exceptions? Don't you apply the exceptions? So for example, in this case, if WOM were selling some of the products for use within Luxembourg, those sales would not be foreign-based company sales income because it would fit within the same country exception. But, so, when do you do that calculation? Is that part of your D2 theory? That would be part of the D2 theory, but that, as Judge Lauber concluded, is one of the special rules that's not applicable here because the exception doesn't apply just on the facts of this case because there were no sales for use within Luxembourg and it was not manufactured in Luxembourg. Didn't, I mean, didn't Judge Lauber, this again, a question about just the actual holding in this case, the ground on which he granted summary judgment, wasn't it, was that based on D2 wholly independent of D1 or was it D2 as then routed through the on behalf of clause of D1? D2 as a provision is not a standalone provision in this sense. It's textually and structurally connected to D1. I'm really surprised you guys concede that because, I mean, Judge Lauber read this and said, boy, you could read this to mean this answers the question whether there is this FBCSI when you have these two conditions met. I mean, I look at D1 and it's a general rule, you know, for determining this foreign base, whatever company's sales income. And then, you know, D2 you read it and it's talking about a particular situation, a special situation one might say. And if these two circumstances are present, one of which is, you know, a certain tax effect, then it says the income attributable to the activity shall constitute foreign base company sales income of the controlled CFC. And the only thing the regs do here is sort of explicate perhaps when the conditions are met. So, I mean, like why in the world isn't the government saying we went under D2 and call it, you know, and you can call it a day, your honor. And if you want to go into this D1 routing and the regs and the exceptions, fine. But, you know, as Judge Lauber said, I mean, why aren't you arguing that? Right. But I guess we don't even have to go to the regs. And that's true. Taking Whirlpool's position that the income derived here was attributable to its branch activities. That's not what they represented to Mexico. They represented to Mexico, and this is how the tax rate disparity was created, that this was income that was earned by its foreign principal. It's unrelated to Mexico. It's not attributable to its Mexican operations. And so, you know, we have applied the regulation to say, okay, well, now this branch is operating in the same manner as a separate subsidiary, and therefore the branch rule applies. And once you apply the branch rule, you look at the income that the remainder has derived, which is, you know, the $45 million that was derived from selling the product both to related parties and by operation of the regs and at related parties. Now, you do contend that the $45 million, or do you? We're just trying to understand, you know, whether our understanding of the facts is correct. I mean, you contend that the $45 million is, within the meaning of D2, income attributable to the carrying on of the activities of WIN. Is that true? In a broad sense, it's... Which, i.e., manufacturing activities? Right, I mean, it's income derived from selling. $45 million was received by the Luxembourg entity for transferring title and risk into the property. This was not income that was received by the part of the CFC that manufactured. There are two income streams in this case. $45 million that the Luxembourg entity earned for giving up the property, for transferring title, for transferring risk. That's the $45 million. That's the part that's not taxed by any jurisdiction. There's a second income stream, which is what WIM paid its branch... Right. I'm sorry, WAM, the Luxembourg entity, paid its branch WIN, which is about $4 million in income for manufacturing. That was taxed by Mexico at 17%. But you don't think the $45 million is attributable to WIN's activities. Is that what you're saying? Well, it was, in a broad sense, in the sense that you wouldn't have something to sell if somebody hadn't manufactured it. Right. It's directly attributable to the sale... I'm sorry, Texas... That's all right. Yeah, it's a hard case for you. Which is... And the sale was done by the foreign principal, as WAM represented to Mexico. If this had been a sale that had taken place in Mexico or by a Mexican branch, it would have been taxed by Mexico. I thought Judge Lauer did say the $45 million is income attributable to WIN's activities. I mean, he said, you can end it right here. He said that's what you've represented to Luxembourg, and that is, in fact, what they've represented. So in that taking their representation that this income was attributable to what was going on in Mexico, it falls within the, what he said, the bare text of the statute. Which is often good enough. That is true. We have presented a case to defend the regulations which we think are valid for three reasons. We think that they are within the specific regulatory grant within D2. We think that they are within the broader regulatory grant in 7805 to implement gaps left explicitly or implicitly by Congress. And at a minimum, I don't think that D2 has, and this is Lauer's conclusion, has the clarity and precision to say that the manufacturing branch rule is unambiguously precluded by D2. Okay. I'll relent on this point, so you can carry on. You know, with regard to the first point about being within the scope of D2 by its plain terms, D2 applies to all branches that have the same effect of a separate subsidiary, not just branches that sell. Look at the preamble which has what we refer to as the two preconditions. They broadly refer to a CFC carrying on of activities through a branch with the same effect as a subsidiary. There's no limitation on selling activities or a selling branch through generic terms in the ordinary meaning of the generic term branch or activity would include manufacturing branch and manufacturing activity. And importantly, both of the shall clauses then follow are qualified by under regulations prescribed by Treasury. Treasury is giving the authority to promulgate regulations that implement the consequences that flow from having a branch that operates like a sub. Well, I mean, I don't think those regs can contravene a shall. They might explicate, for example, when the arrangement has substantially the same tax effect. That would be, I think, a good example of filling in the details. But if for some reason Treasury said, well, in certain circumstances, even when those two conditions are met, we're not going to have these two consequences. I mean, the Treasury couldn't do that. That's not what Congress is saying. Right, I think that's right. I can't imagine a taxpayer would complain. Yes, I think that's right. But the rule does implement the shall consequence. It implements the first shall consequence that individual activity of the branch shall be treated as income of a separate sub for the purposes of determining foreign-based company sales income. Again, no limit to sales or sale activity or sale branch. And the branch is treated as a related person to determine if the CFC has foreign-based company sales income to manufacturing branch. That first clause, when the branch manufactures and the CFC sells. And D2 does more than authorize Treasury to treat branch income as foreign-based company sales income. It authorizes Treasury to treat the branch and its income as a separate subsidiary, a related person for purposes of determining whether there is foreign-based company sales income, a term of art that's defined in D1. So if you don't think the $45 million is income attributable to WINS activities, then you really do have to route through D1. That's correct. And that's what the manufacturing branch rule does. What about... Go ahead. I'm sorry. No, you go ahead. We did raise this in our 28-J letter is that if the regulation, if you throw out the regulation and you take their representations that this branch, that the income, sales income is attributable to its Mexican operations, they don't get out of the statute as Robert pointed out, they do have foreign-based company sales income. Our briefs have taken the position that the regulation is valid and that the income is earned by the Luxembourg entity and fits within the definition of D1 if you treat the branch as a separate subsidiary and there's no one disputed fact. In your view, at least in this case, D2 is simply a device to cancel out the disregarded entity rule. Or to supply or as the tax court said in the VEDCO decision to provide the related person that's required Right. It's a related person, it's not the same person. Exactly. Unless the court has any questions regarding validity, I can address the argument that the regulation doesn't apply? Sure. So, Ruppel's argument that Luxembourg CSC derived no sales income conflicts with the undisputed facts is recognized by the tax court including its own concession that the Luxembourg entity earned $45 million from the sale of property to related persons and that's all that the statute requires. Its argument that the manufacturing branch somehow sold the products conflicts with the law and the facts. The regulation itself, manufacturing branch is defined by its manufacturing activity and sales are performed by the remainder of the CSC. And so a sale is by definition not part of the manufacturing branch's activities because it's limited to manufacturing. It's why it's called a manufacturing branch. What do you do about this reg? And I, you know, frankly I can't keep straight the sub-romanets and all that but obviously you have a reg that says if if the seller of the property if the if somebody in the position of WAM is selling property that has been substantially transformed from the property that it bought, you know, sheet metal and now it's washing machines, then we treat WAM we treat that seller as the manufacturer. Right? No. It's the corporation itself. So if WAM were to substantially transform the property. Which reg is the by such corporation reg? Has those words. Are you talking about the regulatory manufacturing exception? I think so. Which again, under the D2 analysis is not implicated because the manufacturing was purportedly done through WIN and WIN is treated as a separate subsidiary. Okay. It's property manufactured or produced by the controlled foreign corporation. 1-9 5-4-3 It's after example 4. I don't know how to even refer to this stuff. It's subsection D after example 4. I hope you know. I mean, I'm not No, it's alright. Well, okay. But you say that doesn't even apply. That's the D1 reg and you don't think the D1 manufacturing exception applies. Right? Not under the D2 determination of the commission. Not under analysis that the government WINS under D2. Just briefly go back through that again for me. Which reg, which of the regs is it under the determination of foreign based company sales income, that part of the D2 regs? I think so. Your argument about it was manufactured through WIN. Right. And WIN is treated as a subsidiary, so there is no manufacturing by the selling corporation in that case. And which reg, where is that in the D2? Is that the on behalf of reg? Yes. The one in Romanet 2 or the one in Romanet 2 or 1? Well, it's under the special rules under both 1 and 2. The branch and the remainder are treated as separate corporations. And the other special rule that applies both for purposes of determining whether there is a tax rate disparity and determining whether there is foreign based company sales income is that the remainder who is selling shall be treated as selling on behalf of the manufacturing branch. Okay. So we're talking about under the determination of foreign based company sales income Romanet 2, the on behalf of part of that. Okay. And that is not the the logic of the not resolving the summary judgment on D1 in the opinion does not undermine your argument that it was manufactured through WIN? That's correct. Because under D1, that D1 argument that the government says can't be resolved on summary judgment, you're treating the branch and the CFC as one unit. And under that theory the CFC says our manufacturing is being done through WIN and therefore the regulatory manufacturing exception applies. And the government argued there, well it's not, we dispute that it's actually being done through WIN. We think it's being done by the same Mexican CFCs that were doing it before the reorg. As the tax court found, nothing has changed on the ground. For purposes of the D2 argument, we've accepted their position that WIN is doing the manufacturing because WIN is a separate sub than WOM. WOM has foreign based company sales income and cannot claim the manufacturing exemption because it itself is not manufacturing. But they're arguing that WIN didn't do, I mean are you talking about the representation to Luxembourg that WIN did the manufacturing? Or I forget what that representation was. I mean Mr. Gard just told us that they reject the idea that WIN did all the manufacturing, that WOM has all this equipment, etc. It's just their argument in this case that they have been manufacturing through their manufacturing branch and that that's why the manufacturing exemption or exception that all the regulations apply. That just raised the issue of fact that the court would read that it would need to be sent back to the tax court to resolve. We don't think the court needs to get to that because the regulation is valid and it applies here and under D2... Which reg do you mean there? I'm sorry. The manufacturing branch regulation. Okay, I understand which one that is. But so are you routing this through D1, the on behalf of clause or not? Yes, we are. So under D2, once the branch is treated as a separate separate related person and the transaction qualifies as foreign based company sales income treating the branch separately for two reasons selling on behalf of and that's listed in D1 and also WAM is selling to related persons United States Whirlpool and Mexico Whirlpool. It doesn't matter if they're selling to related persons under that particular clause, right? I mean it's to any person on behalf of a related person. That's correct. I'm saying there's two there's four categories. Right. Oh, yeah. It's, you know, I mean it's it's it's an awkward linguistic fit with this situation. Which raises, you know, and mostly creates an ambiguity. I don't know about that. Anyway, we don't need that because. No, I understand. But tell me, so you say though that the regulation which I think Whirlpool is relying upon this, you know, subpart four somewhere in 194-3 property manufacturer produced by the controlled foreign corporation. You say this is wholly an opposite to this D2 analysis. Right? Because this says, I mean this could be read to mean that WAM shall be deemed the manufacturer simply because they're selling transformed property. And that may affect the question whether they're selling it on behalf of someone else. Right? It would. But you say this provision is just inapposite because D2 applies here. In fact, they didn't even argue in this case that the regulatory manufacturing etc. applied. That's why Labo didn't reach it. Okay, so you think that argument wasn't made. But if I'm reading the regs I mean, how would I infer or know that this particular reg is inapposite when the two conditions of D2 are met? Which is what I think you're saying. And I think it's because of the special rules I'm trying to find the special rule that says that the branch and the sub, the branch and the remainder are treated as separate subsidiaries. Separate persons. That's what D2 says. D2 says that. And also it's repeated in the regulation itself. But D2 says treat them as separate entities. Fine. This reg, at least by its terms, arguably says treat WOM as the manufacturer. That's not a conflict between those two things. I mean, they're still separate entities. But WOM's the manufacturer. And so now if I was arguing for Whirlpool, maybe I would say and therefore WOM's just selling on behalf of itself. It's the manufacturer. It's not selling on behalf of WHIN. Fine, they're separate entities, but they're not selling on behalf of. But it's the base company that is doing the selling and the manufacturing in Mexico. And the definition of form-based company sales income is when income has been stripped from manufacturing and allocated to another subsidiary. And that has happened here under D2 because WHIN is treated as a separate sub and the property is being sold by the base company in Luxembourg. I get you on that. But why doesn't this reg tell us actually WOM, for whatever reason, we should treat WOM as the manufacturer, in which case the income's not being stripped from manufacturing. The manufacturer, this reg tells us, is the seller and so the income, presumably, is from manufacturing. Well, the WOM on the facts is not the manufacturer. It's WHIN and WHIN is treated as a separate sub. I understand on the facts. But sometimes, you know, the regs in part, I mean, I appreciate your patience with the generalist audience you're dealing with. And the IRS brief was very helpful in giving up, making concessions to the generalist reader, I will say. But sometimes a reg or a statute tells us to treat something in a counterfactual way, e.g. D2 itself, you know. And so, I mean, why shouldn't we read this reg again, subpart 4, property manufactured by such corporation, etc. I mean, the facts notwithstanding, why doesn't this reg direct us to treat WOM as the manufacturer? I mean, I might just be totally, you know, wrong. That's why I'm asking in my suppositions here. I mean, my understanding of how this operates is that the manufacturing exception in the regulations applies when the CFC is doing the manufacturing. And since the CFC is not doing the manufacturing under our D2 analysis, a separate corporation, when it's doing the manufacturing, this regulation did not apply. Okay. Why isn't there a fact issue about who did the manufacturing here? You know, I mean, you've heard the argument that there's a lot of stuff, at least on paper. Why is it so clear that WOM's the manufacturer? Well, the supplies that WOM purchased was part of its cost of goods sold, and it was part of the Mexican requirement. They hold title to the property. It's part of its purchase and sale activity, is buying the supplies, holding title to the property from the very beginning, when it's just raw materials, all the way through the work in progress until the WOM collects saline activities, not part of the manufacturing activities. Okay. They say we didn't get credit for it, but they did, because WOM received $800 million in gross receipts, and it was reduced down to $45 million in income because part of the cost of goods sold, and this is on page 1445 of the record, it's the form 5471 that Council was talking about, they subtracted the $600 million in supplies, they subtracted their depreciation costs for the equipment that they owned. Okay. Well, why don't you take a couple of minutes to wrap up, and of course, if anybody has further questions, that doesn't count against your couple of minutes. There are no other questions about validity or applicability of the reg. You just asked that the court, from the court's ruling, that the $45 million in sales income that was stripped off the manufacturing in Mexico be correctly viewed as foreign-based company sales income. Okay. All right, thanks. I'll hear from Mr. Gar. Thank you, Your Honor. I'd like to begin with the question about whether or not you can just run this all through D-2 and avoid the regulation, and I think the answer to that is no, for several reasons. First, the government's argument in this case has never been that this is income of the branch. It's always been that this is income of the remainder, and I would ask you to look at page 48 of its brief, at pages 2561 of the appendix and 2580 of the appendix, and that's why my friend from the government resisted your questions, Judge Kethledge, to suggest that this was manufacturing income of the branch. I mean, their theory is that it's income of the remainder, and that's the way they have to cast it under their own regulation. So that's point one. Point two is that D-2 is not self-executing. They need a regulation in order to invoke D-2. You can't set the regulation aside and say, aha, this is... But a reg as to what? And, you know, I mean, I'd be skeptical that the reg could contravene the shalls in D-2. I mean, would you agree with that? Well, I think what the reg does, it contravenes the notion that this has to be income of the branch by creating a separate context. They might have passed a regulation that said, look, any income by a branch is foreign company-based sales income, even manufacturing income. But they didn't do that, and the reg says, hey, this has to be sales income. Income from manufacturing the products is not sales income, it's manufacturing income. And that's why the regulation... 45 mil is sales income. Excuse me? 45 million. Oh, I would disagree with that, Your Honor. I mean, if you just think of that in terms of D-1, the D-1, what you have is the purchase of raw materials from unrelated entity, the manufacture of finished refrigerators and washers, and the sale of those finished products to Whirlpool U.S. The $45 million in profits on that comes from the manufacturing contracts, which is cost plus 6%. And the question is, well, what's the 6% for? It's for building the machines. It's not for selling them. I mean, you could say it's sales in a broad sense, but D-1 tells you in the substantial transformation test, which is in A-4 of the regulations, that that is manufacturing... that by definition, this is not a situation where the foreign-based company sales income applies. And then the last thing... so the regulation... they have to rely on the regulation to get to D-2. But with respect to the government here, all the confusion in this case is created by the regulation. The whole reason we get into this on behalf of fiction is because of the regulation. Their effort to spin this back through D-1. Congress passed a statute even in this complex area, which is fairly clear. D-1 tells you what foreign-based company sales income in the case of the controlled foreign corporation. And D-2 says that in the particular situation when you're dealing with a branch, this is how you apply the rule there. And the government has come up with a whole new category of income, which is income of the remainder, and tried to run it back, not just through D-2, but through D-1. I mean, the regulation doesn't work. You didn't get a chance to write the briefs in this case. I mean, just very succinctly, how does the reg contravene or otherwise go beyond the statute? Sure. If you look at 94 and 954 D-2, it refers to activities attributable to the branch. And the regulation in this case, and I refer to this section, particularly B-2i, is focused on income of the remainder, which is by definition income outside of the branch, income that is not attributable to the branch. It's income that they attribute to the sales, what they call the sales office in Luxembourg. It's by definition not income of the branch. And that direct inconsistency between the statute and the reg dooms the reg under Chevron Step 1. And all their arguments about policy and loopholes, those are all Chevron Step 2 arguments. I mean, D-2 doesn't say income of the branch. It says income attributable to activities of the branch. That's right. But their theory is that this is attributable to activities of the remainder, the so-called selling that they claim fictionally took place in Luxembourg. So you think the 45 mil is not attributable to the selling activity? No, it's not attributable to WINS manufacturing activities. No, no, no. I mean, this is getting to the factual issue the regulation applies. Our position is that the 45 million is attributable to the manufacturing, building products in Mexico. And at the very least there's a disputed issue of fact on that. But that doesn't go to the validity argument. The validity argument is based on the disconnect between the fact that the statute focuses on income of the branch and the regulation focuses on income that by definition is outside of the branch. Income that they attribute to the quote-unquote office in Luxembourg. That's why my friend was resisting your questions trying to redirect it back to the branch because their theory is income of the remainder which is something else. That's the answer to my question. If I could just make one other point, your honor. Take a minute or less. Sure. I would make just two quick points. One, they don't dispute that what happened on the ground in terms of manufacturing didn't change. And that's at page 16 of their brief. And yet, their theory under their own regulation requires you to adopt the fiction that all the manufacturing is done by the small unit that's just responsible for the employees. That's part of the manufacturing branch. But that's certainly not the entire manufacturing operation. You can't manufacture washing machines and refrigerators without the raw materials, $100 million of that, without the equipment, without the space. None of which Wynn was doing. And the last thing I would say is we didn't concede that this was sales income. We said that $45 million was attributable to WOM. This is in the 1058 of the appendix, the 5471. And that's because the income from manufacturing in Mexico is attributable to WOM. It's manufacturing income. So I think we would ask this court to hold that the regulation is invalid. And that gets rid of D2. And then you can send it back for further consideration on D1 if you'd like to. Just the manufacturing branch? That's what you're shooting at here? REG? Well, the REG. That's what the tax court relied on to get them in. REG is like 40 pages long. So you're after Roman at 2 called manufacturing. That's exactly right. You're exactly right. B2, the manufacturing branch rule. If you decide that that rule is nevertheless valid, then we would say at a minimum you send it back. There's a huge factual dispute on whether all of this $45 million can somehow be attributable to sales so that none of it goes to the fact that we were actually building washing machines and refrigerators here. Thank you very much, Your Honors. Thank you both for your arguments and for your assistance as we try to deal with this case that you brought to us. Okay. Okay. Clerk may adjourn.